**STATE of Missouri, Plaintiff–Respondent,**

v.

**Susan TOWNSEND, Defendant–Appellant.**

No. 18733.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 23, 1994.

Donald E. Sotta, Joplin, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Beal, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant Susan Townsend guilty of assault in the second degree, § 565.-060,[1] and assessed her punishment at 90 days in jail and a fine, the amount to be determined by the court. After defendant's motion for new trial was overruled, the court entered judgment, sentencing defendant to 90 days in jail. Defendant appeals.

Defendant's sole point is that the evidence is insufficient to support the verdict and the trial court erred in ruling otherwise.

Defendant's challenge to the sufficiency of the evidence requires this court to determine whether there was sufficient evidence from which a reasonable juror might have found her guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55[2, 3] (Mo. banc 1989). We accept as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.* This court considers any portions of defendant's evidence which would support a finding of guilty "because defendant, by putting on evidence, takes the

---

**1.** All references to statutes are to RSMo 1986, V.A.M.S.

chance of aiding the State's case." *State v. Johnson,* 447 S.W.2d 285, 287[2] (Mo.1969).

Section 565.060 reads, in pertinent part:

1. A person commits the crime of assault in the second degree if he:

. . . . .

(3) Recklessly causes serious physical injury to another person.

"A person 'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.-016.4. As used in Chapter 565, "Serious physical injury" means "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 565.002(6).

In addition to its formal portions, the information charged: "[O]n or about between December 19, 1990 and January 14th 1991, in the County of Barton, State of Missouri, the defendant recklessly caused serious physical injury to Ashley Townsend by shaking Ashley Townsend."

The victim, Ashley Townsend, was born November 4, 1990. Defendant is the victim's step-grandmother. Ashley's mother, Kimberly Townsend, was a 15–year–old high school student when Ashley was born. The baby and her mother lived in the home of defendant and her husband, George Townsend, the baby's grandfather.

On January 14, 1991, the baby was left in the care of defendant while the mother was attending high school. On that day, defendant took the baby to a hospital in Lamar. On the same day, the baby was transferred to a hospital in Springfield, where she was under the care of James Wilson, D.O., a pediatrician and co-director of the pediatric intensive care unit. The diagnosis included a skull fracture and other findings to be related. The skull fracture had been sustained that day.

The state made no effort to place upon defendant criminal responsibility for the skull fracture. The case was submitted to the jury on the basis, as charged in the information, that serious physical injury was caused to Ashley by reason of defendant shaking her.

During the state's case, a videotape of an interview of the 45–year–old defendant was shown to the jury. The interview took place on January 28, 1991, and was conducted by Sheriff William Griffith and Sgt. Parks of the Missouri Highway Patrol. During the course of that interview, defendant, who had received the Miranda warnings, told the officers that on the morning of January 14, 1991, Ashley was seated in a car seat which was sitting on a chair in the Townsend home. She said that one of her cats jumped on the car seat, causing it to tip forward. Defendant made an unsuccessful attempt to grab the baby, but Ashley's head struck the ledge of a coffee table. Defendant saw no visible injury to the baby.

Defense witness George Townsend, from whom defendant was divorced at the time of the trial, testified that defendant first told him about the cat episode "about a month after it occurred."

About 1:30 p.m. she was preparing to give the baby a bath and noticed that the baby's body was limp. She took the baby to a hospital in Lamar. Later that day the baby was transferred to the Springfield hospital. Defendant admitted that she had not mentioned the alleged cat episode to anyone prior to January 28. She had been interviewed by officers a week earlier.

Defendant told the officers that on January 11, 1991, she, the defendant, had a headache. Ashley was crying. Defendant shook the baby in order to stop the crying. On the tape, defendant demonstrated the manner in which she shook the baby. Defendant held the baby in her outstretched arms and shook her back and forth. The jury could reasonably infer that the shaking was vigorous. While shaking the baby, defendant said, "Stop it, Ashley, stop it."

Defendant admitted that on December 29, 1990, she shook the baby because the baby was yelling a lot. She said that it was possible she could have shaken the baby on other

occasions. Defendant said, "At times I can be two different people."

At the trial, testifying in her own behalf, defendant admitted, on direct examination, that she had shaken Ashley on a couple of occasions, that sometimes Ashley would cry very hard and get the hiccups. "About the only way she would stop crying was if you would just gently shake her. And most of the time she was down on the bed. And I would just hold her shoulders and go, 'Ashley, Ashley, please don't cry,' and she usually stopped."

On cross-examination by the prosecutor, the following testimony was elicited:

Q. The child, Ashley, you said she was having some medical problems; is that correct?

A. Yes.

Q. Before this January 14 problem?

A. Um-hmm.

Q. And, as a consequence, she, as most babies would, probably cried a lot, didn't she?

A. Yes, quite a bit.

Q. And this in spite of the fact that you would give her a bottle or change her diaper? Sometimes, that wouldn't do the trick, would it?

A. Right.

Q. She'd continue to cry?

A. Sometimes she didn't. She didn't cry a lot, though, really.

Q. And you agree that you did tell the sheriff and Miles Parks, even before the tape recording, that you held her and shook her like that, and said, "Stop it, Ashley, stop it," didn't you?

A. Yes. But, she was never shaken hard, per se. It wouldn't have been anything that anyone wouldn't have done, because she was a small baby, and I would have never shaken a small baby hard.

James Wilson, D.O., a state's witness, testified:

I am a pediatrician and co-director for the Pediatric Intensive Care Unit at Cox South Hospital. My expertise is related to pediatric critical care. I saw and treated Ashley on January 14, 1991, at Cox South.

Ashley had been referred by Dr. Joustra of Barton County, with his diagnosis of skull fracture/apnea, which is a problem breathing. At that time her level of consciousness was also impaired. Shortly after admission, a CT scan, a computerized brain scan, was obtained. This scan showed evidence of extensive bleeding within the brain and beneath the skull. There were also findings suggestive of old blood, as well as areas of fresh bleeding, and also areas to suggest calcification, again indicating old injury as well as acute injury. The significance of the findings of old blood and old calcification is that those findings are highly suggestive that the child had undergone previous trauma, given the distribution of the findings and the bilateral diffusions, which means that there was the old fluid, almost like partially resolved blood, present around both areas of the brain. There was also evidence of atrophy, which is degeneration, and this involved the frontal aspects of the brain. These findings are very suggestive for a shaken baby syndrome.

I have seen cases of shaken baby syndrome other than in the case of Ashley. *Based upon the tests performed and the treatment of Ashley, I formed an opinion as to the cause of her severe brain damage. Given the tests performed and the child's global deficits, it is my firm belief that this represents a shaken baby syndrome. Even though there is a skull fracture, I still say it's shaken baby syndrome.*

There is no doubt that the child presented with a skull fracture, and there was evidence on the scan of fresh blood associated within the distribution and site of this fracture. However, the appearance of the brain, particularly the frontal pole atrophy, this is something that is seen with a shaken baby, because a common mechanism where one would see no external signs is to hold the child, grasp the child at the shoulder level, and shake. Now, this results in both acceleration and deceleration injuries to the brain. And given the child's anatomy, the most common area, and the expected area, to be damaged with atrophy

are the frontal poles. And this is indeed what we saw on the scan.

The combination of the deceleration and acceleration injuries also produces venous type bleeding. And the small bridging veins that surround the brain and take up space between the brain, the lining of the brain and the skull, are often broken. And this results, again, in a characteristic pattern of blood and old blood. And, indeed, the blood was present, in technical terms, in the inner hemispheric fissure, which is an area that we would expect the bleeding.

And surrounding both hemispheres was the effusions or hydromas, which represent old blood that has partially resolved. But, as it does, damaged tissue will often produce a calcification. And this was felt to be present on the scan. The basis for my diagnosis and for my belief in this case are those findings.

. . . . .

*Q. And is the damage to the frontal lobe consistent with having been caused by shaken baby syndrome, or a fracture to the side of the head?*

*A. Those findings are consistent with a shaken baby syndrome.*

It is possible to cause damage to the brain by shaking the baby and for the baby to appear to be somewhat normal for a week or a few days. Ashley was hospitalized from January 14, 1991, to March 14, 1991. When she was dismissed, Ashley was severely impaired. I believe this is a case of shaken baby syndrome, and I reached that belief within 48 hours of Ashley's course.

On cross-examination, Dr. Wilson testified: "The younger the child, the less shaking is required to result in damage. *The calcification and old blood was suggestive of a previous trauma. The trauma was obviously sufficient to produce hemorrhage bleeding."*

At the trial, held in February 1993, Kimberly Townsend, the baby's mother, testified that the baby was brain damaged. "She has to have nurses 24 hours around the clock. She has a feeding tube. She's hooked up to a monitor."

Sheriff William Griffith testified that on January 14, 1991, about 4:30 or 5:00 p.m., he was called to the Lamar Hospital. Dr. Joustra had contacted him because he had a serious problem "with an infant baby." The sheriff went from the hospital to the Townsend home. Defendant told the sheriff she had no idea what had happened to Ashley. Three days later, the sheriff talked to defendant at the Springfield hospital. He said that her story at that time was basically the same thing that she told him on the 14th, that she really didn't know. He questioned her again on January 28, 1991, and, during the taped interview, she first told him of the cat episode. The sheriff also testified that defendant told him that on two different occasions, one around December 29 and one around January 11, when Ashley wouldn't stop crying defendant had picked up Ashley and shaken her. Under cross-examination by defense counsel, Sheriff Griffith testified that Dr. Wilson had mentioned to him the shaken baby syndrome, and that is what led up to the sheriff's asking defendant about shaking.

Defendant's mental state, conscious disregard of the risk, could be proven by circumstantial evidence. *State v. Lowrey,* 764 S.W.2d 957, 959[3] (Mo.App.1989). Defendant disregarded the substantial risk of serious physical injury to the baby, approximately two months old, when she vigorously shook her on at least two occasions in order to stop her from crying. This disregard was a gross deviation from the standard of care a reasonable person would exercise in a similar situation. *Lowrey,* at 959; *State v. King,* 723 S.W.2d 442, 443[1] (Mo.App.1986). There was sufficient evidence for the jury to find defendant acted recklessly in vigorously shaking the baby.

The testimony of defense witness Jerome Murphy, M.D., a pediatric neurologist, was to the effect that the baby's serious physical injury, consisting of permanent brain damage, was caused by the skull fracture and not by the shaking. The jury saw fit to believe the testimony of Dr. Wilson, and not that of Dr. Murphy, on the issue of causation of the serious physical injury sustained by the

baby. This court holds that the evidence is sufficient to support the verdict.

The judgment is affirmed.

CROW and GARRISON, JJ., concur.