**STATE of Missouri, Respondent,**

v.

**Janet L. CANDELA, Appellant.**

No. 67096.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 23, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 28, 1996.

Application to Transfer Denied
Oct. 22, 1996.

854

Frank Kimberly Carlson, Union, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Judge.

Appellant, Janet L. Candela ("defendant"), appeals the judgment of conviction for murder in the second degree entered by the Circuit Court of St. Charles County after a jury trial. We affirm.

Defendant lived with Keith Okai and three children: Amber Okai, Keith's four-and-a-half year old daughter from a previous marriage; Nicole Zigemeyer, defendant's three year old daughter from a previous marriage; and Kyle Okai, the ten month old son of Keith and defendant. On or about February 20, 1992, Amber sustained severe head wounds. Surgery was performed but to no avail. Amber remained unconscious for several days, with her condition worsening until she eventually showed no sign of brain function. Amber died of her injuries on February 24, 1992.

On October 29, 1992, the state charged defendant with murder in the second degree, in violation of RSMo § 565.021.1 (1986). The state alleged defendant, on February 20, 1992, "with the purpose of causing serious physical injury to Amber Lynn Okai, caused the death of Amber Lynn Okai by striking her with a blunt instrument and shaking her."

Defendant's trial began on August 1, 1994, and continued through August 8, 1994. Viewing all evidence in the light most favorable to the verdict, the following was adduced at trial:

Around 3:15 p.m. on February 20, 1992, defendant carried Amber into the O'Fallon Fire Department's Station One, located across the street from defendant's residence. Paul Koenig, an emergency medical technician ("EMT") with the fire department, met defendant as she arrived. Amber was unconscious and was not breathing. Koenig put Amber on a nearby table and restored her breathing. Koenig noted bruises everywhere on Amber's face, head and body, even on the top of her feet. Defendant told Koenig Amber had fallen off a swing. Koenig also

heard defendant say, without being asked, that she did not beat Amber.

Randy Sanders, a firefighter and certified EMT, helped treat Amber at the fire station. Sanders noted Amber had trouble breathing, displayed multiple bruising around her face, chest and legs, was very thin and pale, and did not have much hair. Sanders also noted Amber's eyes were blackened and were not responding to or following light, symptoms of a head injury. Sanders testified defendant gave him "multiple stories" with respect to what happened to Amber: she said Amber had fallen out of bed, then said Amber had fallen off a swing, and then said she had found Amber unconscious in the bedroom.

Linda House, a secretary at the fire station, testified, "I heard [defendant] say as soon as I walked in that no one had beat the child[;]" defendant volunteered this statement without being asked. Defendant told House Amber had woken from a nap in this condition, and also that Amber was in psychiatric care for "physically abusing herself." Sherman Blackwell, a firefighter present when Amber was brought in, corroborated House: "I didn't ask her if she had done anything. Just asked her what happened and she said that she hadn't done anything and that the little girl had a habit of hurting herself."

Paramedic Janice Ramsey, arriving at the scene a short time later, noted bruising on all parts of Amber's body visible to her. Ramsey testified defendant told her she had put Amber down for a nap, and later heard a gurgling sound; when she went into the bedroom she found Amber unconscious; and, Amber's bruises were caused by falling off a swing. Defendant further told Ramsey Amber had sustained her head injuries from falling down the stairs, but later said Amber received them from falling out of a bunk bed. Defendant told Ramsey Amber's accidents had taken place over a two-week period, and that Amber "intentionally hurts herself." Ramsey stated the injuries she observed were inconsistent with defendant's explanations, as Amber was bruised on both sides of her face and body, while injuries from falls are usually found on just one side of the body.

While the paramedics were attending to Amber, defendant went back to her residence to check on the other two children. Albert Renaud, a patrolman with the O'Fallon Police Department, met with defendant there and asked her what happened. Defendant stated Amber had woken up from a nap and began to gurgle and cough. Defendant told Renaud Amber had been hurt by falling off a swing, and her facial injuries were caused by hitting herself in the face with the swing and scratching herself in the face.

The paramedics transported Amber to St. Joseph's Hospital West in Lake St. Louis. Defendant accompanied Amber to the hospital. Two nurses at St. Joseph's, Maureen Pendergrass and Loraine Bowman, were in the emergency room when Amber arrived. Both nurses noted Amber had multiple bruises and very sparse hair. Pendergrass testified she overheard defendant tell someone she had been unable to rouse Amber from her nap, that "she had just heard sounds and went in and couldn't wake her up. . . ." Bowman testified she saw defendant standing over Amber and overheard her say to no one in particular, "How could a swing do this."

Dr. Elaine Shaw, a pediatrician at St. Joseph's, attended to Amber when she was brought in. Amber appeared emaciated to Dr. Shaw, and had extensive bruises all over her body, some more recent than others as evidenced by their coloration. Amber displayed symptoms consistent with serious head trauma, such as lack of consciousness, uncontrolled, involuntary movements of her arms and legs, difficulty in breathing, a dilated right pupil, and unstable blood pressure. Dr. Shaw discovered bleeding inside the head consistent with trauma, but determined Amber's skull had not been fractured. Dr. Shaw testified Amber's head injury was consistent with the type of injury sustained in car accidents, though the injuries to her body were not. Dr. Shaw also testified she had never seen such extensive injuries result from a fall from a swing, and had treated children who had fallen from second-story windows onto concrete who suffered fewer injuries.

Because Amber needed more extensive care, Amber was transported from St. Joseph's to Cardinal Glennon Children's Hospital in St. Louis, again accompanied by defendant. There, Dr. Thomas Pittman performed a craniotomy, removing a portion of Amber's skull and taking out a subdural hematoma, or a blood clot that had formed inside Amber's head. Dr. Pittman, a neurosurgeon, observed that Amber's brain was discolored and swollen, indicating it had been without oxygen or blood for a period of time; the skull was not fractured; Amber was very small for her age, had multiple bruises, and exhibited no conscious movement but only reflexive reactions to pain; one of her eyes was dilated, and the other was nonreactive; and there was retinal hemorrhaging.

Diane Williams, a clinical nurse specialist, observed Amber in the intensive care unit at Cardinal Glennon after the craniotomy. Williams noticed Amber's body bore extensive bruising, in areas where children normally do not sustain bruises in their everyday activity; she appeared undernourished; and she was missing hair. Williams testified, over defendant's objection, that she suspected abuse due to Amber's bruising and low body weight.

Scott Walker, a detective with the O'Fallon Police Department, and Erika Allstead, a worker with the Division of Family Services ("DFS"), met with defendant at Cardinal Glennon. Walker brought defendant to the O'Fallon police station. According to Allstead, when they arrived at the police station defendant stated without being asked, "I didn't do it and I don't beat Amber."

Defendant wrote out a statement about what had happened at the police station, which she later discussed with Walker after he informed her of her *Miranda* rights. In her statement, defendant claimed: she had spent the morning of February 20, 1992, running errands with Amber and the other children; upon returning home that afternoon, she put all the children in bed for naps; Amber later came walking toward defendant, with her eyes rolled back, making a gurgling noise; at this point, defendant took Amber across the street to the fire station.

The next day, February 21, 1992, Allstead and Walker interviewed Nicole, defendant's three year old daughter, at defendant's parents' house. Defendant was not present. When asked how Amber was injured, Nicole told Walker and Allstead "Amber was bad" and "Mommy spanked Amber and Amber fell down the steps." Nicole demonstrated what happened by throwing a doll from the top of the basement steps. Nicole stated Amber had fallen all the way down the stairs, and defendant had tried to catch her. According to Walker, defendant never mentioned Amber had fallen down stairs.

Shari Curatolo Payne was the wife of a friend of Keith Okai's and had babysat Amber prior to the time defendant moved in with Keith. Payne testified she talked to defendant at a bowling alley a few weeks prior to Amber's death. According to Payne, when she asked "how it was going with Amber[,]" defendant answered, "Amber was nothing but a brat[,]" and "[t]hat she couldn't stand her and that she wishes she was just out of the way."

Keith Okai testified he woke up at about 6:00 a.m. on February 20, 1992, was at work by 7:00 a.m., and did not see Amber until that evening at Cardinal Glennon. Keith denied ever striking Amber on or about the face or head, shaking her, or forcing her head against a wall or floor, but admitted he disciplined Amber by spanking her. Keith testified he saw bruises on Amber's head shortly before February 20, 1992, and was told by defendant Amber had been hit in the head by a swing. He further testified he noticed other bruises in the month or so preceding Amber's death, which concerned him, as some of these bruises were not of the kind sustained by children in everyday activity. Keith never saw Amber actually get these bruises. Defendant offered explanations for how the bruises were caused. Keith testified he and defendant agreed defendant would not discipline Amber, due to an incident regarding Amber in which defendant "started spanking her and then she did it not so hard at first, and then she picked up harder and started spanking her harder."

Defendant testified in her own defense and denied ever striking or shaking Amber or throwing Amber against a floor or wall. Defendant claimed she saw Amber get struck in the face by a swing a few days before Amber was brought to the hospital. Defendant also claimed Keith "whipped" Amber on the evening of February 19, 1992. With respect to February 20, 1992, defendant testified: she, her mother, and the three children ran some errands in the morning; she and the three children returned home in the afternoon, where she told the children to lay down and take naps; while she was in the living room she heard a noise "like somebody was walking and a bump into the refrigerator[,]" and saw Amber in the kitchen walking towards the living room; Amber's eyes were rolled back and she was making a gurgling noise; Amber collapsed in the kitchen; defendant picked Amber up and, receiving no response, took her across the street to the fire station. Defendant claimed she had no recollection of what happened after that or of any statements she made, nor did she know what caused Amber's injuries. Defendant acknowledged she had been the only adult with Amber the entire afternoon.

In addition to the above witnesses, the state called the following doctors as expert witnesses: Dr. Pittman, who performed the craniotomy on Amber; Dr. Phillip Burch, a forensic pathologist and Deputy Chief Medical Examiner for the City of St. Louis, who conducted the autopsy; Dr. Mary Case, a forensic pathologist and Chief Medical Examiner for St. Louis County and St. Charles County; Dr. Wilbur Smith, a professor of pediatrics and radiology at the University of Iowa; and Dr. Randall Alexander, an associate professor of pediatrics at the University of Iowa.

Dr. Pittman testified retinal hemorrhaging in children was "either associated with high speed auto accidents or what we think of as Shaken Baby Syndrome." The symptoms he observed in Amber were consistent with "some form of shaking or battering." Dr. Pittman agreed a four year old was susceptible to shaken infant syndrome, particularly in this case, since "a lot of the reasons that make younger kids susceptible are pres-

ent[,]" such as Amber's small size, her proportionately large head, and her poor musculature development. The underlying injury to Amber's brain was "inconsistent with an injury that occurred more than a few hours before[;]" the bruising, retinal hemorrhaging, subdural hematoma and brain infarction he observed were consistent with shaken infant syndrome; and he suspected the symptoms (except for the bruises) derived from the same injury.

Dr. Burch performed the autopsy of Amber on February 24, 1992, and observed bruising around the eyes, brain swelling, and retinal hemorrhaging. Dr. Burch opined, based upon his observations from the autopsy, that Amber died from blunt head trauma. When asked whether this would be consistent with shaken infant syndrome, Dr. Burch answered, "... There could be an overlaying element of Shaken Infant Syndrome. I can't differentiate the two at this point." In Dr. Burch's professional opinion, a child with the injuries he observed on Amber would not be ambulatory after receiving such injuries: "Immediately after receiving such an injury, this child would either be unconscious, convulsing or dead." While Dr. Burch believed Amber was too old to be susceptible to shaken infant syndrome, he agreed her physical condition—such as her lack of muscle development—would be a factor in determining whether shaken infant syndrome applied to her.

Dr. Case reviewed the autopsy conducted by Dr. Burch. Dr. Case, in describing shaken infant syndrome, stated it did not occur much past the age of five or six, and was most commonly seen in very young children. Dr. Case testified the necessary conditions for a diagnosis of shaken infant syndrome were "appropriate circumstances along with the subdural hematoma and retinal hemorrhages...." Dr. Case opined the cause of Amber's death was "massive head injury that can be best described as a closed head injury and if you want a more specific term for this particular child, what we refer to as the Shaken and Impact Syndrome." Dr. Case defined this syndrome as applicable to situations where a child has been both shaken and struck on the head. According to Dr. Case,

Amber's injuries were inconsistent with what would be sustained from typical childhood play or from falling off a swing, falling out of bed, being hit by a swing, or falling down stairs. Dr. Case agreed it was possible for an adult to inflict such injuries upon a four-and-a-half year old child.

Dr. Smith and Dr. Alexander, experts on shaken infant syndrome, testified after Dr. Case. Dr. Smith testified a child sustaining the injuries sustained by Amber would be immediately symptomatic after receiving the injury, and such symptoms would be unconsciousness, gurgling, rolling up of the eyes, respiratory difficulty, and stiffening of the body. Dr. Smith further testified, "To a reasonable medical certainty, [Amber's] injury was sustained somewhere between fourteen twelve and sixteen twelve." Dr. Smith opined Amber died from abusive head trauma, basing his opinion on

> characteristic lesions on the CT, the fact that Amber was not involved in an automobile accident, did not fall from two stories, the fact that there is such a severe injury that Amber was rendered virtually instantly symptomatic. The lesions, the injuries that are shown are absolutely characteristic for the Shaken Impact Syndrome.

Dr. Smith further testified Amber's injuries would not be consistent with a fall off a bunk bed, a fall off a swing, or a fall downstairs, as the injuries were "too profound and too severe." Dr. Smith also stated, "She could not have been ambulatory after sustaining the injuries I observed."

Dr. Alexander averred he was familiar with shaken baby syndrome and shaken impact syndrome and defined them both. Dr. Alexander observed, from the medical records he had examined, a subdural hematoma, retinal hemorrhages, bruises, brain swelling, patterns of bleeding, and nerve shearing, all of which were consistent with shaken infant syndrome. Dr. Alexander testified this syndrome could, theoretically, be diagnosed at any age, but five was functionally the latest age in which it appears and most cases involved children under the age of two. Dr. Alexander opined the cause of Amber's injuries "were a combination of violent shaking and impact with an object[,]" the retinal he-

morrhages and the pattern of brain injury "are certainly those we see in Shaken Baby Syndrome[,]" and Amber's injuries were not consistent with a fall from a swing or down stairs, or being hit with a swing.

Defendant filed motions for a judgment of acquittal at the end of the state's evidence and at the end of all the evidence; both were denied. The matter was submitted to the jury on August 8, 1994. The jury returned a guilty verdict the next day. On October 19, 1994, the trial court denied defendant's motion for new trial and, following the jury's recommendation, sentenced defendant to twenty-seven years. This appeal followed. Additional facts will be adduced as relevant to the discussion of the eleven issues raised on appeal.

## I.

For her first point on appeal, defendant contends the trial court erred in allowing the state's Exhibit Sixteen—a photograph of Amber taken after the craniotomy—to be published to the jury, as the exhibit was never admitted into evidence. In response, the state asserts nothing in the record shows Exhibit Sixteen was published to the jury, and, at any rate, the exhibit was admitted into evidence.

■ At the outset, we note this point was not raised in defendant's motion for new trial. Defendant's motion asserted the trial court erred in allowing all the photographs into evidence as exhibits, but said nothing about the purportedly erroneous publication of any exhibits to the jury. In jury-tried cases, an allegation of error not included in a motion for new trial is not preserved for appeal and is reviewable only for plain error resulting in manifest injustice or miscarriage of justice. Rules 29.11(d), 29.12(b); *State v. Thompson*, 856 S.W.2d 109, 111 (Mo.App. E.D.1993).

Exhibit Sixteen was a photograph of Amber's head after the craniotomy at Cardinal Glennon, which showed a shaved portion of her head and shunts (drain tubes) protruding

from her skull.[1] The photograph was first referred to during direct examination of Paul Koenig, the EMT who first saw Amber. The following colloquy took place:

Q. I show now what's been marked State's Exhibit Number Sixteen for purposes of identification ... Do you recognize that photograph?

A. Yes.

Q. And is that a fair and accurate representation of what the child's hair looked like on that date on the side-view?

A. On that there now it looks like he shaved her head a little bit. The rest of her head is light.

Q. You are talking about there at the site?

A. At the side it looks like it has been shaved.

Q. At the front or the side?

A. Right in here, (indicating) but it was like that it was real light.

The state moved for admission of Exhibit Sixteen into evidence. Defendant objected. The court allowed voir dire of Koenig with respect to the photograph. The following exchange occurred during voir dire:

Q. Officer Koenig, this picture is not a fair and accurate representation of what you saw when you saw the child out in front of the fire station, is it?

A. Everything except for that and the shaved area.

Q. So that only a portion of this photograph is the same, am I correct?

A. Correct.

Q. Okay. You didn't take the photograph?

A. No.

Q. And you weren't present when it was taken?

A. No.

Q. So with regard, a portion of the photograph looks the same?

A. Yes.

Q. This photograph doesn't represent a child who is clothed and you saw a child who was clothed, is that correct?

A. Yes.

[PROSECUTOR]: Whether she is clothed or not clothed, it is just a picture of a face.

[DEFENSE COUNSEL]: They will get it in, not through this witness. He is not the proper witness to present this. This is not a fair and accurate representation of what he saw at the time that the child was first presented to him.

[PROSECUTOR]: It is as far as for the purposes what the hair on the side looked like. If he'd like, I'll cover up the offending portion before presenting it to the jury.

THE COURT: Okay.

Counsel then approached the bench and the following took place:

[DEFENSE COUNSEL]: They have all sorts of pictures that they can show this officer. There is accurate representation.

[PROSECUTOR]: There is nothing that represents as far as the hair loss. I think that is of relevance to this.

[DEFENSE COUNSEL]: He has testified to this. I'm not disputing that. This is another picture that he is trying to put in that has no relevance other than to inflame the passion of the jury.... There is no dispute as to the evidentiary portion of this with regard to the hair loss, but the picture.

[PROSECUTOR]: As I offered, I'm willing to cover that up as this time for defense counsel. It will show, I can cut a piece of paper to cover that.

[DEFENSE COUNSEL]: Why don't you reserve it until later on when they have somebody come in who can accurately describe it.

[PROSECUTOR]: Accurate description of what the hair loss was that the fireman did observe.

[DEFENSE COUNSEL]: They have plenty.

THE COURT: Covering the top portion?

[PROSECUTOR]: I can do that.

---

1. This exhibit, as well as an affidavit of defendant's appellate counsel and a copy of the state's exhibit list, are included in a supplement to the record on appeal. Defendant's motion to file this supplement, taken with the case, is herein granted.

After a recess, direct examination resumed and Exhibit Sixteen was put before Koenig again, partially covered by two post-it notes:

Q. ... Fireman Koenig, this is the photograph that I have just shown you. You say that's what her hair looked like outside of the portion that was covered, that is covered right here?

A. Yes.

Defendant made no further objection and requested no further relief. Neither defendant nor the state asked for, nor did the trial court make, a ruling as to whether Exhibit Sixteen was admitted into evidence.

The state subsequently referred to Exhibit Sixteen during the testimony of several later witnesses. The prosecutor presented Exhibit Sixteen to Randy Sanders in the following manner:

Q. ... *I'm going to hand you a couple of exhibits that have already been admitted, State's Exhibit Number Three and State's Exhibit Number Sixteen.* Is that, outside of the apparatus that is hooked up to her, is that a fair and accurate representation of what that child looked like?

A. Yes.

Q. And the same goes for Exhibit Number Sixteen?

A. Yes.

(Emphasis added.) The following took place during the direct examination of Dr. Burch:

Q. Doctor, I'm going to hand you or show you a couple of exhibits here. State's Exhibit Number Sixteen and at this time I am going to be able to pull this off of this. Is that the child, Amber Okai, that you performed the autopsy on, on February 24, 1992?

A. Yes.

Q. And is that the way she appeared, is that a fair an [sic] accurate representation of what she looked like on that day?

A. Yes.

Finally, the following questions were posed to Shari Curatolo Payne during direct examination:

Q. ... *Let me show you what has been entered into evidence already, State's Exhibit Number Sixteen and State's Exhibit Number One.* Is that what Amber looked like when you were taking care of her?

A. Yes, it was.

Q. And what about the condition of her hair?

A. Her hair was just like that.

Q. I'm going to show you State's Exhibit Number Sixteen. Did her hair look anything like that?

A. At the bowling alley her hair did.

(Emphasis added.) Defendant did not object to any of the above references to Exhibit Sixteen. The state rested after Payne's testimony, and shortly thereafter the trial court permitted the state to publish its exhibits (including, presumably, Exhibit Sixteen) to the jury. Nothing in the record shows a ruling by the court either admitting Exhibit Sixteen or excluding it.

■ "The delivery to the jury for their consideration of an exhibit not received in evidence constitutes error." *Osborne v. United States,* 351 F.2d 111, 115 (8th Cir. 1965). Such error constitutes a ground for reversal if the defendant's substantive rights were prejudiced, but is harmless error if the reviewing court is "satisfied beyond a reasonable doubt" the error did not contribute to the conviction. *United States v. Bishop,* 492 F.2d 1361, 1365 (8th Cir.1974). *See also United States v. Warner,* 428 F.2d 730, 737–738 (8th Cir.1970). Defendant argues there was a possibility the publication of Exhibit Sixteen to the jury contributed to her conviction, and therefore the judgment must be reversed.

■ However, where an exhibit is never formally offered and received into evidence, but is marked as an exhibit and identified, is treated by both the prosecutor and defense counsel as if it had been received into evidence, and is never objected to, then the exhibit is "in evidence" for all purposes as if it had been formally offered by the state and received by the court. *State v. Taylor,* 433 S.W.2d 273, 274 (Mo.1968); *State v. Robinson,* 664 S.W.2d 543, 547 (Mo.App. E.D.1983); *State v. Sanders,* 608 S.W.2d 507, 509 (Mo. App. W.D.1980). Assuming Exhibit Sixteen

was published to the jury,[2] the trial excerpts cited above clearly show Exhibit Sixteen was regarded by the trial court and the parties as having been admitted into evidence.

In particular, the prosecutor prefaced questions to Sanders and Payne with comments that Exhibit Sixteen had already been admitted into evidence. Defendant made no objection at either time, nor did defendant note in her motion for new trial that Exhibit Sixteen was never admitted into evidence. Additionally, defense counsel recognized Exhibit Sixteen was admissible, as indicated by some of his own comments while objecting to Koenig's identification of the exhibit. Exhibit Sixteen was, in fact, identified by Dr. Burch as a fair and accurate representation of what Amber looked like after surgery.

On the facts present here, we find Exhibit Sixteen was "in evidence" for all purposes despite the lack of a formal admission of the exhibit into evidence. The state, defendant, and the trial court clearly regarded Exhibit Sixteen as having been introduced and received into evidence. Accordingly, the publication of Exhibit Sixteen to the jury was not error. Defendant's first point is denied.

## II.

For her second point on appeal, defendant alleges the trial court erred in allowing the opinion testimony of the state's five expert witnesses, Drs. Pittman, Burch, Case, Smith and Alexander, as the state failed to lay a proper foundation establishing (1) the theories relied upon by the witnesses were generally accepted in the relevant scientific community, (2) the factual basis for each witness' opinion, and (3) the sources and materials upon which the witnesses based their opinions were reasonably reliable and of the type relied upon by members of the witnesses' profession.

■ Defendant made no objection at any time that shaken infant syndrome and shaken impact syndrome were not recognized the-

ories in the medical field. Nor did defendant object to the experts' opinions on the ground the record failed to adequately show the factual basis for their opinions. Where no objection is made at trial, such claims are not preserved for review; "[c]laims of inadequate foundation will not be considered for the first time on appeal." *State v. Blue*, 875 S.W.2d 632, 633 (Mo.App. E.D.1994). We review defendant's claims *ex gratia.*

■ Defendant contends there was insufficient evidence shaken infant syndrome and shaken impact syndrome were generally accepted theories in the relevant scientific (medical) community. Much of defendant's argument on this point consists of an attack upon the legitimacy of shaken infant syndrome and shaken impact syndrome as medical theories. Defendant asserts in her brief, "There was absolutely no evidence that Shaken Baby Syndrome, Shaken Infant Syndrome, Shake Impact Syndrome, Shaken Slam Syndrome or any other syndrome these witnesses might have invented had gained wide acceptance in the prevalent medical or scientific field." She further argues, "None of the witnesses testified that the syndrome was widely accepted in the field of medical pathology or anywhere, and none testified their theory was otherwise reasonably reliable."

Defendant's assertions are contradicted by the record. Dr. Pittman was asked on direct examination, "Earlier you used the term Shaken Infant Syndrome. Is that an accepted syndrome or diagnosis as far as in the medical community?" Dr. Pittman answered, "Yes." Likewise, the following exchange took place during Dr. Smith's testimony:

Q. How many times have you done an examination or occasion to see cases of shaken, of this Shaken Impact Syndrome in children?

A. Probably around two hundred.

---

**2.** The state claims nothing in the record on appeal shows Exhibit Sixteen was, in fact, published to the jury. The state takes particular issue with the affidavit of defendant's appellate counsel, included in the supplemental record on appeal, which claims the prosecutor told them Ex-

hibit 16 "went to the jury." The state contends this affidavit was not part of the trial record and cannot be considered on appeal. Due to our disposition of defendant's first point, however, we need not resolve this particular question.

Q. All right. Is this a syndrome recognized in the medical community?

A. Yes, it is.

Further, contrary to defendant's claims in her brief, all the state's expert witnesses were consistent in their definitions of shaken infant and shaken impact syndromes, their descriptions of the symptoms and causes of these syndromes, and the range of ages in which these syndromes appear. Finally, shaken infant syndrome has been implicitly recognized by Missouri courts as a valid diagnosis. *See State v. Toran,* 878 S.W.2d 913 (Mo.App. E.D.1994); *State v. Townsend,* 870 S.W.2d 501, 503–504 (Mo.App. S.D.1994); *State v. Bragg,* 867 S.W.2d 284, 287 (Mo.App. W.D.1993). We see no error.

Defendant also argues the state failed to lay a proper foundation for the factual basis for the doctors' opinions, citing cases which hold expert witnesses may not testify to matters not observed by them unless such matters are presented by means of hypotheticals based upon facts or data in the record. *See State v. Johnson,* 504 S.W.2d 334, 336–337 (Mo.App.1973). Dr. Pittman (who performed the craniotomy) and Dr. Burch (who performed the autopsy) had direct knowledge of Amber's injuries and physical condition. As for the opinions of Dr. Case, Dr. Smith, and Dr. Alexander, the record shows the following:

■ In determining the cause of Amber's death, Dr. Case had studied the autopsy report, photographs taken during the autopsy, police records "which included a large number of investigations where numerous people, ... were interviewed[,]" and the hospital records from Cardinal Glennon Children's Hospital. When asked her opinion as to the cause of Amber's death, defendant objected on the ground Dr. Case could not rely on the police reports:

If he is asking for her opinion or her opinion is based upon the autopsy report, the hospital records, as I suppose she might be able to give an opinion, but the police reports as an indicator of her liability are nothing more than an accumulation of hearsay and are not facts upon which she can base an opinion and provide a medical opinion. That invades the prov-

ince of the jury.... The police reports are not scientific.... The police reports are what taint her ability to render a medical expert opinion....

The trial court permitted the state to ask Dr. Case her opinion as long as it was based on the autopsy report, medical records, and photographs.

Dr. Smith and Dr. Alexander testified next. Immediately prior to their testimony, defense counsel questioned both doctors outside the presence of the jury with respect to a packet of records the state had sent them in connection with the trial. This packet included medical records, autopsy reports, police and fire department reports, and DFS reports. The following was adduced during defense counsel's voir dire of Dr. Alexander:

Q. And in developing your opinion, I presume that you had to use all of these things including the police reports to evaluate this case properly, is that correct?

A. I'm not sure if I had to have the police reports. Once I reviewed them, they were supplemental to it. They added some information, but some of the questions didn't require the police report. Some weren't directed towards those issues.

Q. I understand that to come to an overall opinion to whether this child suffered from Shaken Baby Syndrome which is your area of expertise, it would be necessary for you to evaluate the entire file together, isn't that correct?

A. No, I don't think I would phrase it that way at all. To say that Shaken Baby Syndrome at one level, I wouldn't need that information. At another level any time you get history, regardless of what sources that history comes in, that's information that you want to review.

After voir dire, defense counsel objected to Dr. Smith and Dr. Alexander testifying on the ground that because they relied on "police reports, witness reports, statements, and otherwise[,]" their testimony was "tainted and inadmissible" since it was based on hearsay and involved areas in which the doctors

were not considered experts.[3] The prosecutor stated he was willing to limit his questioning as he did with Dr. Case and "not to ask questions as far as coming out of the police reports." The trial court overruled defendant's objection and permitted the doctors to testify.

The prosecutor asked Dr. Smith the following on direct examination:

Q. Have you had the opportunity to examine the medical records, autopsy records, CT photos, x-ray photos, hospital photographs and autopsy photographs of a child known as Amber Okai?

A. Yes, I have.

Q. And do you have an opinion as to the cause of these injuries to Amber Okai?

A. Yes, I do.

Dr. Smith was similarly asked the following on direct:

Q. Have you had the opportunity to examine the medical records, autopsy records, CT films, x-ray films, hospital photographs and autopsy photographs of the child by the name of Amber Okai?

A. Yes.

Q. And do you have an opinion as to the cause of these injuries to Amber Okai?

A. Yes, I do.

As the record shows, Dr. Case, Dr. Smith, and Dr. Alexander based their opinions on the autopsy report, CT scans, photographs and X-rays, all of which had been previously admitted into evidence. The trial court expressly did not permit, and the state did not ask, these doctors to testify with respect to the police reports or DFS reports. Again, we see no error.

■ Defendant further contends the state "failed to meet its threshold foundation" for the opinion testimony of Drs. Case, Smith and Alexander by failing to prove the sources used by the doctors in reaching their opinions were reasonably relied upon by experts in their respective fields or were otherwise reasonably reliable. Defendant takes specific issue with the police reports. However, as shown above, the basis for the experts' opinions was limited to the medical records, CT scans, photographs, and X-rays. We also note Dr. Alexander's voir dire testimony downplaying the significance of the police records purportedly relied upon by himself and Dr. Smith. Further, Missouri courts have permitted expert testimony based on medical records and police reports. *See State v. Hendrix*, 883 S.W.2d 935, 940–942 (Mo.App. W.D.1994).

■ Finally, defendant argues the state's use of shaken infant syndrome and shaken impact syndrome constituted a "profile prosecution," under which "[t]he person who fits the profile—the adult parent—bears the presumption of guilt." Defendant cites *State v. Taylor*, 663 S.W.2d 235 (Mo.banc 1984), for her proposition that such profile prosecutions are improper, since "the defendant walks into court with the burden of proving causation which excludes his or her criminal agency."

■ We find no merit in defendant's argument. The "profile" at issue here—shaken infant/shaken impact syndrome—was based upon characteristics of the victim, not defendant, and was used to determine the cause of death, not defendant's responsibility for that death. *Taylor*, contrary to defendant's contentions, does not stand for the proposition that profiles and syndromes improperly impose the burden of proof upon the accused. Rather, *Taylor* holds that expert testimony concerning rape trauma syndrome is inadmissible when used as a means of vouching for the victim's credibility—i.e., using expert testimony on rape trauma syndrome to verify the victim was telling the truth in claiming she was raped. 663 S.W.2d at 239–240.

■ The admission of profile testimony, or general evidence describing behaviors and characteristics commonly observed in victims, is within the discretion of the trial court. *State v. Silvey*, 894 S.W.2d 662, 671 (Mo.banc 1995); *State v. Williams*, 858 S.W.2d 796, 798–801 (Mo.App. E.D.1993). Only when such profile testimony addresses the alleged victim's credibility is it inadmissi-

---

**3.** Defendant also objected on the ground the state's failure to provide four pages of handwritten notes made by Dr. Alexander prior to trial constituted surprise and violated Rule 25.03. This objection is addressed in defendant's eighth point on appeal.

ble, since it then usurps the jury's role. *Williams,* 858 S.W.2d at 799. Missouri courts have allowed the state to offer expert testimony regarding shaken infant syndrome to identify the cause of the victim's injuries, as was done here. *See Toran,* 878 S.W.2d at 913; *Townsend,* 870 S.W.2d at 503–504; *Bragg,* 867 S.W.2d 284, at 287. No expert testified as to defendant's responsibility for the injuries displayed by Amber, or addressed her credibility. The expert testimony was diagnostic only: Amber's injuries were consistent with the shaken infant and/or shaken impact syndromes.

The trial court did not abuse its discretion in permitting the state to use the shaken infant and shaken impact syndromes to determine the cause of Amber's death. Defendant's second point is denied.

### III.

For her third point on appeal, defendant asserts the opinions of Dr. Smith and Dr. Alexander were based on inadmissible hearsay—namely, the police reports and other documents included in the packet sent to them by the state. As noted above, however, the state's questioning of these two witnesses was limited to what they observed in the medical records, CT scans, photographs and X-rays already entered into evidence.

■ Assuming, *arguendo,* Dr. Smith and Dr. Alexander did rely at least in part on the police reports in testifying to their opinions, we still see no error. Expert witnesses are entitled to rely on hearsay evidence as support for their opinions, as long as that evidence is of a type reasonably relied upon by other experts in the field; such evidence need not be independently admissible. *State v. Rowe,* 838 S.W.2d 103, 110 (Mo.App. E.D. 1992); *State v. McFall,* 737 S.W.2d 748, 755– 756 (Mo.App. S.D.1987). Medical records and police reports, such as were purportedly relied on by Drs. Smith and Alexander here, can be relied upon by expert witnesses in giving their opinions. *See Hendrix,* 883 S.W.2d at 940–942. We see no error. Defendant's third point is denied.

### IV.

Defendant's fourth point on appeal concerns the following testimony of Dr. Smith:

Q. ... With the training and study that you have done, can you state with medical certainty as to whether these injuries appear to be of an accidental nature?

[DEFENSE COUNSEL]: Same objection, your Honor. That invades the province of those people over there. That is their decision to make. It is outside the scope of expertise.

THE COURT: Objection overruled.

A. Again, there is no history and this wouldn't be a casual slip and fall, fall from four feet or anything like this. This would be a history of an automobile accident. Now, if Amber was brought in from I–70 with these injuries, sure it was accidental, but lacking that—

[DEFENSE COUNSEL]: That is not responsive to the question. I'm going to object.

THE COURT: Sustained, your objection is sustained.

Q. ... Is it consistent with the Shaken Impact Syndrome?

A. Yes, sir.

Defendant contends the trial court allowed Dr. Smith to invade the province of the jury by permitting him to testify Amber's injuries were not accidental, as this testimony constituted an impermissible factual conclusion on an issue ultimately for the jury—Amber's injuries could not have happened by accident—and an impermissible conclusion of law with respect to an element of second-degree murder—intent to cause serious physical injury.

■ We disagree, as Dr. Smith did not, in fact, testify Amber's injuries were not the result of an accident. Dr. Smith never answered the question posed to him, and was prevented from doing so by defendant's second objection.

■ However, had Dr. Smith opined Amber's injuries did not appear accidental, there would still be no error. It is true expert testimony is inadmissible if it constitutes a conclusion of law. *See State v. Clem-*

*ents,* 789 S.W.2d 101, 109–110 (Mo.App. S.D. 1990) (trial court erred in allowing expert in first degree murder trial to give opinion on whether defendant deliberated prior to commission of acts; expert could only testify as to whether defendant had capacity to deliberate). Nor may experts give an opinion relating to the credibility of witnesses. *See Taylor,* 663 S.W.2d at 240 (expert's testimony that rape victim did not fantasize the rape and suffered from rape trauma syndrome amounted to vouching for victim's credibility and invaded jury's province to make this determination); *Williams,* 858 S.W.2d at 801 (fundamental error in allowing expert's testimony that sexually abused children rarely lie, incidence of lying among children is very low, and physical findings support what child victim says). However, an expert may testify to his or her opinion regarding an ultimate issue in a criminal case, as long as the expert does not express an opinion on the guilt or innocence of the defendant. *Id.* at 798.

 Here, Dr. Smith was asked his opinion, based upon his observations of the records and his experience and training, as to whether Amber's injuries "appear to be of an accidental nature[.]" This question did not seek a conclusion of law with respect to defendant's intent to cause serious physical injury, nor did it seek a comment on the credibility of any witness, particularly defendant. Dr. Smith was asked his opinion as to an ultimate issue (whether Amber's death was accidental), not whether defendant intended to cause, and did cause, Amber's death. We see no error. Defendant's fourth point is denied.

## V.

For her fifth point on appeal, defendant contends the trial court erred in permitting Dr. Alexander to conduct a demonstration in which he shook a rag doll as an illustration of the type of shaking involved in shaken impact syndrome.

Dr. Alexander was asked during direct examination to demonstrate the type of shaking which would cause Amber's injuries on a rag doll provided by the state. Defense counsel objected, arguing the doll did not accurately represent a child with respect to the force involved, the weight of the child, and the child's musculature. The court overruled the objection and allowed the demonstration. On cross-examination, Dr. Alexander agreed the rag doll he used in his demonstration had no musculature and provided no evidence of resistance. He further testified, "I think just about anybody is going to have a hard time with a thirty-five pound weight[,]" although on redirect he opined a person weighing 105 pounds (such as defendant) was capable of causing the injuries sustained by Amber. Later in the trial, defense counsel had each juror pick up an actual thirty-five pound child.

 The trial court is vested with broad discretion in admitting or rejecting demonstrative evidence, due to its superior vantage point for balancing the probative value of such evidence against its prejudicial effect. *State v. Holmes,* 609 S.W.2d 132, 135–136 (Mo.banc 1980). "Demonstrative evidence which tends to establish any fact in issue or throw light on the controversy and aid the jury in any way in arriving at a correct verdict is admissible...." *Id.* at 136.

 The demonstration at issue here was not to show what in fact happened on February 20, 1992, but to illustrate the type of shaking generally involved in shaken impact syndrome. It was limited to this purpose. Defendant was given ample opportunity to prove up the dissimilarity between the rag doll and the real-life Amber and prevent the jury from being misled, and in fact did so by getting Dr. Alexander to concede on cross-examination the doll lacked resistance and musculature. Defendant further rebutted the demonstration and illustrated the difference in weight and musculature by having each juror pick up an actual thirty-five pound child. The trial court did not abuse its broad discretion in permitting Dr. Alexander's demonstration. Defendant's fifth point is denied.

## VI.

 For her sixth point on appeal, defendant contends the trial court erred in overruling her motion for judgment of acquittal

at the close of the evidence,[4] as the state failed to prove beyond a reasonable doubt each element of the charged offense, and the evidence was therefore insufficient to support the guilty verdict as a matter of law. Defendant asserts the state failed to prove beyond a reasonable doubt (1) defendant struck Amber, (2) defendant acted with the purpose to cause serious physical injury to Amber, and (3) Amber's death was not the result of an accident.

■■■ A person commits murder in the second degree if he or she, with the purpose of causing serious physical injury to another person, causes that person's death. RSMo § 565.021.1(1). In determining whether there is sufficient evidence to support the jury's verdict, the reviewing court must view all the evidence in the light most favorable to the verdict, giving the state the benefit of all inferences therefrom and disregarding all contrary inferences. *State v. Grim*, 854 S.W.2d 403, 411 (Mo.banc 1993).

■■■ There was sufficient evidence here from which a jury could find defendant struck Amber, defendant acted with the purpose to cause Amber serious physical harm, and Amber's death was not accidental. "Circumstantial evidence and permissible inferences from it are acceptable, and generally will provide the necessary proof." *State v. Harris*, 854 S.W.2d 853, 856 (Mo.App. E.D. 1993). Defendant admitted she was the only adult with Amber during the afternoon of February 20, 1992. Defendant's inconsistent explanations for what caused Amber's injuries, and her unsolicited disavowals of hitting or beating Amber, illustrate knowledge of guilt. There was evidence defendant had previously exhibited dislike of Amber and had struck her in the past. Expert medical witnesses testified the severe head trauma which caused Amber's death was sustained a short time, if not immediately, prior to her arrival at the fire station and hospital in the late afternoon of February 20, 1992, and could not have been caused by a fall from a swing or bunk bed or an accidental fall down the stairs, but rather was consistent with

violent shaking and impact with an object. The seriousness of Amber's head trauma provided, in itself, a basis for inferring defendant knew her actions were practically certain to cause serious physical injury: "A jury can infer intent to cause physical bodily harm when 'under the circumstances, the prohibited result may reasonably be expected to follow from a voluntary act, irrespective of any subjective desire on the part of the offender to have accomplished the prohibited result.'" *State v. Franklin*, 854 S.W.2d 55, 58 (Mo.App. W.D.1993) (citations omitted).

In sum, there was sufficient evidence to support the jury's verdict of guilty. The trial court did not err in denying defendant's motion for a judgment of acquittal. Defendant's sixth point is denied.

## VII.

For her seventh point on appeal, defendant asserts the trial court erred in prohibiting her from entering evidence of a charge of felony child abuse filed by the state against Keith Okai and later dismissed.

The state had originally issued a three-count information on March 9, 1992, charging defendant with one count of murder in the second degree and one count of abuse of a child, and charging Keith Okai with one count of abuse of a child. The child abuse counts against both defendant and Keith were subsequently dismissed. Defendant offered into evidence the child abuse charge against Keith Okai; the state objected, stating wife "was also charged with the very same offense and they were both dismissed on the very same day. It has got no relevance to this case." The trial court sustained the objection.

Defendant argues this charge was part of the record and negated the state's circumstantial case that defendant was the only person who had access to Amber on February 20, 1992, and was the only one who could have caused the injuries that killed Amber. Because defendant never included this claim

---

4. Because defendant presented evidence on her own behalf after the state rested, she waived any contention of error related to the denial of her motion for judgment of acquittal at the close of the state's evidence. *State v. Purlee*, 839 S.W.2d 584, 587 (Mo.banc 1992).

in her motion for new trial, we review for plain error only.

 "Evidence of either the conviction or acquittal of one jointly accused with a defendant is inadmissible as substantive evidence of defendant's guilt or innocence." *State v. Carter,* 847 S.W.2d 941, 947 (Mo.App. E.D.1993). The fact one co-defendant was cleared of any charges "is 'wholly irrelevant to any issue in defendant's trial.'" *Id.* (citation omitted). The state's dismissal of the child abuse charge against Keith Okai is completely irrelevant to the case at bar; the state dismissed the child abuse charge against defendant as well. There was no prejudice amounting to manifest injustice in keeping this evidence out. Defendant's seventh point is denied.

## VIII.

For her eighth point on appeal, defendant claims the trial court erred in admitting over her objections (1) the expert opinion testimony of Drs. Smith and Alexander and (2) the testimony of witnesses Blackwell, Ramsey, Pendergrass and Bowman as to statements made by defendant, on the ground admission of this testimony constituted surprise and violated the discovery rules and orders of the court.

We first address defendant's claims regarding Dr. Smith and Dr. Alexander. Defense counsel objected at trial to Dr. Smith's and Dr. Alexander's testimony on the ground of surprise, claiming the state violated Rule 25.03 by not providing defense counsel with a copy of Dr. Alexander's handwritten notes, which counsel claimed he was "absolutely bound to receive under the rules." Dr. Alexander had written these notes while reviewing the police reports, medical records, and other materials sent to him by the state prior to trial.

 Rule 25.03(5) requires the state to disclose to defense counsel "[a]ny reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons;...." If the state fails to timely disclose evidence to the defense, the trial court may, within its

sound discretion, order appropriate sanctions. *State v. Coutee,* 879 S.W.2d 762, 769 (Mo.App. S.D.1994). Appellate courts intervene only if the state's failure to timely disclose resulted in fundamental unfairness. *Id.*

 We see no error here requiring reversal. Dr. Alexander's notes merely summarized information already set out in police reports and medical records, which had been previously disclosed to defendant. Also, defense counsel had the opportunity to talk with both Dr. Alexander and Dr. Smith well before trial; the two were listed as witnesses in supplemental replies to defendant's request for discovery, and their addresses and phone numbers were enclosed in a January 28, 1994, letter to defense counsel. Further, the record supports a finding that the state, itself, was unaware of Dr. Alexander's notes until trial: the prosecutor claimed Dr. Alexander's notes had never been forwarded to the state, and stated, "I have complied with discovery as far as what I had." Finally, defendant could have moved for a continuance as an alternative to the exclusion of the doctors' testimony, if concerned with the adequacy of her cross-examination; she failed to do so. A defendant's failure to ask for a continuance "can be properly considered by the appellate court in determining whether the trial court abused its discretion." *State v. Enke,* 891 S.W.2d 134, 138 (Mo.App. S.D. 1994). "Once surprise has occurred, the proper remedy is to request a continuance or postponement." *State v. Brass,* 781 S.W.2d 565, 566 (Mo.App. E.D.1989).

There was no evidence the state's discovery violation—if there was one—amounted to fundamental unfairness or substantively affected the outcome of the trial. Nor did defendant move for a continuance. The court did not abuse its discretion in refusing to exclude the testimony of Drs. Smith and Alexander.

Defendant also claims surprise with respect to the testimony of several witnesses as to statements made by defendant on February 20, 1994. However, defendant objected at trial only with respect to Sherman Blackwell, and her argument with respect to any other witnesses has not been preserved for review.

Blackwell testified defendant "kept saying that she didn't do anything and the little girl was under psychiatric care and that she had fell off the swing and hit her head." Blackwell further stated, "I didn't ask her if she had done anything. Just asked her what happened and she said that she hadn't done anything and that the little girl had a habit of hurting herself."

■■■ Similar testimony was presented through other witnesses (Koenig, Sanders, and House) without objection. The testimony at issue here was duplicative. "If evidence is improperly admitted, but other evidence before the court establishes essentially the same facts, there is no prejudice to defendant and no reversible error." *State v. Carter*, 670 S.W.2d 104, 108 (Mo.App. W.D. 1984). If there were any violations of the discovery rules regarding the state's alleged failure to disclose defendant made these statements to Blackwell, such violations did not have a substantive impact on the outcome, nor did they amount to fundamental unfairness. Further, as with the notes of Dr. Alexander, defendant's proper remedy was to move for a continuance, which she did not do. We see no error. Defendant's eighth point on appeal is denied.

## IX.

We address defendant's ninth and tenth points together. Defendant contends the trial court erred in allowing (1) Paul Koenig to testify with respect to the cause and age of the bruises he saw on Amber's face and body, and (2) Randy Sanders to testify "[t]he injury that we saw at the table was not consistent with the story I was receiving[,]" as both witnesses were incompetent to give such testimony, such testimony was speculative, and such testimony constituted impermissible opinions on defendant's credibility.

■■■ First, defendant did not object to any part of Koenig's testimony that arguably referred to the cause of Amber's bruises, including Koenig's statement that Amber "had bruises on her face where it looked like, you know, a person could possibly have grabbed her. There were three finger bruises on this side and one on this side where

somebody grabbed somebody." This argument is therefore not preserved for review.

■■■ Turning to Koenig's testimony on the significance of the colors of the bruises he saw on Amber, Koenig testified he learned the correlation between the color of bruises and their age from a chapter on contusions and abrasions in a book used in his EMT training class. Over defendant's objection, Koenig testified yellow bruises "are bruises that are older, healing bruises[,]" while "[t]he darker blue and black bruises are newer." Koenig then testified to seeing yellow bruises on Amber's body and dark blue or black bruises on Amber's head and face.

There was sufficient foundation evidence to show Koenig was qualified to testify as to the correlation between the color of the bruise and the age of the bruise; namely, Koenig's EMT training. Koenig's testimony was an aid to the jury, as this correlation is not something necessarily within the knowledge of lay jurors. There was no prejudice to defendant, as identical testimony was adduced during the examination of Sanders and Dr. Shaw. As for defendant's argument that Koenig's testimony constituted an improper opinion on defendant's credibility, this was never raised as an objection at trial or in the motion for new trial and was therefore not preserved. At any rate, we fail to see how this testimony constituted an opinion on defendant's credibility. The admission of Koenig's testimony was not error.

Defendant also claims the trial court erred in permitting certain testimony of Sanders. Sanders testified defendant gave him "multiple stories" with respect to what happened to Amber: she said Amber had fallen out of bed, then said Amber had fallen off a swing, and then said she had found Amber unconscious in the bedroom. Sanders then testified:

Q. What were your observations?

A. She was breathing very shallowly and that we should go further into first aid treatment, which we did. We then asked, as I said, we asked more questions to find out if the mechanism of injuries went with what was told by the female at the table.

Q. Did it appear to be consistent to you?

A. The injury that we saw at the table were not consistent with the story I was receiving.

Defendant objected a few questions later, alleging Sanders was "not competent and qualified to testify." The objection was overruled. There was no contention at trial or in the motion for new trial that Sanders' testimony constituted an improper opinion on defendant's credibility and we review this latter contention for plain error only.

■■■ With respect to the foundation for the above testimony, there was sufficient evidence of Sanders' qualifications—his certification as an EMT and several years' experience in responding to emergency calls—to withstand review on the facts here. We also find Sanders' statement was not an impermissible opinion on defendant's credibility. Sanders was not asked to, nor did he, testify as to defendant's veracity. Sanders' testimony was merely an observation that Amber's extensive injuries were not consistent with what would be sustained from a fall off a swing or bed or a fall down stairs. We see no error requiring reversal. Defendant's ninth and tenth points are denied.

## X.

For her final point on appeal, defendant contends the trial court erred in denying her motion for mistrial and allowing in evidence that Amber was abused, on the ground this evidence (1) constituted inadmissible evidence of uncharged crimes, namely, child abuse, (2) could not be admitted to show motive, intent, absence of mistake or accident, common scheme or plan, or identity of the person charged, and (3) was highly prejudicial and without probative value.

Defendant specifically refers in her brief to the photographs of Amber taken at the hospital which show preexisting bruises, and the testimony of Diane Williams, the clinical nurse at Cardinal Glennon who observed Amber in intensive care after the craniotomy and later stated at trial she suspected abuse due to Amber's bruising and low body weight. Defendant objected to Williams' testimony and moved for a mistrial; the trial court overruled the objection and denied the motion.

■■■ Evidence of prior uncharged crimes, wrongs, or acts is inadmissible, unless it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, the identity of the accused, or a signature *modus operandi*. *State v. Coleman*, 857 S.W.2d 363, 364 (Mo.App. E.D.1993). Such evidence must be logically relevant—it must have some legitimate tendency to establish the defendant's guilt of the charges for which he or she is currently being tried—and legally relevant—its probative value must outweigh its prejudicial value. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo.banc 1993). A multitude of Missouri cases involving murder or assault have upheld the admission of prior misconduct of the defendant toward the victim as evidence of motive, intent, or absence of mistake or accident. *See State v. Williams*, 865 S.W.2d 794, 801–804 (Mo.App. S.D.1993), and cases cited therein.

■■■ The evidence of abuse adduced at trial in this case was admissible to show an intent on defendant's part to cause serious physical injury to Amber, and to refute defendant's claim that Amber's injuries were accidental. The admission of this evidence was not error. Defendant's final point is denied.

Based on the foregoing, the judgment of the trial court is affirmed.

GERALD M. SMITH, P.J., and RHODES RUSSELL, J., concur.